1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                  SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| FUJIKURA COMPOSITE AMERICA, INC., | Case No.:  24-CV-782 JLS (MSB) |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| ALEXANDER DEE, an individual, and 3V PERFORMANCE LLC, a California Limited Liability Company, doing business as ARETERA GOLF, | (ECF No. 2) |
| Defendants. | |

Presently before the Court is Plaintiff Fujikura Composite America, Inc.'s ("Plaintiff" or "Fujikura") *Ex Parte* Motion for a Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction ("Mot.," ECF No. 2).  Plaintiff accompanied its Motion with the supporting declarations of Fujikura's president and chief operating officer ("CEO") David Schnider ("Schnider Decl.," ECF No. 1-4) and Plaintiff's counsel Shawn J. Kolitch ("Kolitch Decl.," ECF No. 1-3).

On May 7, 2024, the Court issued an Order ("Order," ECF No. 12) (1) denying Plaintiff's request for a temporary restraining order and (2) construing Plaintiff's Motion as a motion for a preliminary injunction.  Order at 7–8.

Defendants Alexander Dee ("Dee") and 3V Performance Inc. ("Aretera") (collectively, "Defendants") then filed their Opposition (Opp'n, ECF No. 24) on May 23, 2024, alongside the declaration of Alexander Dee ("Dee Decl.," ECF No. 24-1) and select evidentiary objections ("Evid. Objs.," ECF No. 24-2). One week later, Plaintiff filed a Reply ("Reply," ECF No. 26), which included the declaration of Yoshihito Kogawa ("Kogawa Decl.," ECF No. 26-1) and a supplemental declaration by David Schnider ("Suppl. Schnider Decl.," ECF No. 26-2).

The Court held oral argument on June 26, 2024. ECF No. 29. Having carefully considered the Parties' submissions and the law, the Court now **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for the following reasons. First, because Defendants are presently depriving Plaintiff of its opportunity to enjoy a "first to market" advantage stemming from the launch of novel technology, Plaintiff has shown likely irreparable harm. Second, the weight of the evidence suggests Plaintiff is likely to succeed on the merits. Third, any harm stemming from the cessation of sales of a product built using a misappropriated idea does not shift the balance of the equities in Defendants' favor. Finally, issuing an injunction protecting Plaintiff's trade secret golf shaft concept maintains the balance—struck by the California legislature—between safeguarding employee mobility and incentivizing innovation.

## BACKGROUND

## I.    Fujikura Establishes Its Reputation

Plaintiff—a Delaware corporation headquartered in Carlsbad, California—produces "golf shafts used by amateur and professional players worldwide." Schnider Decl. ¶ 2. Plaintiff hired Dee in 1998 as a design engineer. *Id.* ¶ 6. Before starting work, Dee signed an agreement "assigning all of his rights in employment-related intellectual property conceptions to Fujikura[] and prohibiting him from using or disclosing any of the company's confidential information outside of the scope of his employment." *Id.*; *see also* Compl. Ex. A (the "Confidentiality Agreement").

/ / /

That same year, Fujikura launched the "Speeder 757" golf shaft, the first shaft to incorporate a multi-directional "Triax" material that "resist[s] ovalization of the shaft throughout the swing." Suppl. Schnider Decl. ¶ 3. By 2001, the Speeder shaft became "the most popular shaft used by professional golfers on the PGA Tour." *Id.* ¶ 4. This popularity carried over to the consumer market—the "Speeder line" by 2006 was "the most popular shaft line in both the OEM custom and aftermarket categories." *Id.* Riding this surge of popularity, Fujikura "roughly tripled its shaft business." *Id.*

Eventually, however, every golfer ends up in a bunker. By 2007, other shaft companies had mimicked Speeder's internal construction, and Fujikura saw its market share decline as a result. *Id.* ¶ 5. Based on this trend, Fujikura's decisionmakers surmised that their surge of success was largely due to their "first-to-market advantage with the trade secret Triax shaft technology." *Id.* ¶ 6. In the coming years, Fujikura thus developed new golf shafts in hopes of recapturing its birdie streak.

Dee became vice president of engineering at Fujikura in 2008. Schnider Decl. ¶ 7. While Dee was in this role, Fujikura launched multiple lines of golf shafts incorporating "spread tow" woven carbon fibers—"fibers that have been pressed flat before being woven together at right angles."[1] *Id.* ¶¶ 12–14. These included the "Blur" line in 2010 (which used spread tow material in the outer layer of the shaft) and the "Ventus" line in 2018 (which incorporated a spread tow layer in the "mid/handle section of the shaft"). *Id.* ¶¶ 13–14. In addition, the Ventus line incorporated a "trade secret technology . . . known as VeloCore, which [allowed for] superior performance on the PGA Tour." Suppl. Schnider Decl. ¶ 7.

Fujikura hit it straight down the fairway with the Ventus line. Like Speeder before it, Ventus first became the most popular shaft on the PGA Tour, and then "the most popular premium shaft line in both the OEM custom and aftermarket categories." *Id.* ¶ 8. Thanks to this success, Fujikura once again "roughly tripled its shaft business." *Id.* As with

---

[1] Due to its woven configuration, spread tow material resembles a basket weave. *See, e.g.*, Compl. ¶ 44.

Speeder, Fujikura's decisionmakers believe that their "first-to-market advantage[]" with VeloCore was crucial to their gains.  *Id. ¶¶* 10–11.

## II.  Plaintiff Develops the Axiom Line

Fujikura did not rest on its proverbial green jacket.  Between 2018 and 2020, Dee led the development of a "new line of 'ultra-premium' shafts" known as the Axiom line. Schnider Decl. ¶¶ 15–16.  These shafts used spread tow carbon material to a greater extent than any other golf shaft; said material "ma[de] up between 45% and 60% of the weight of the shaft." *Id. ¶¶* 15, 17.  More specifically, Dee's team hoped to use "spread tow fabric in one or more of the bias plies[2] in the core of the shaft, potentially along the entire length of the shaft, which to Fujikura's knowledge had never been done before." *Id.¶* 15.  After more than two years of development efforts, Plaintiff discovered how to use spread tow material for "most or all of the bias plies of a shaft," i.e., "the entire core of the shaft." *Id.* ¶¶ 18–19.  Plaintiff branded prototypes in this Axiom line as "AX1" or "Alpha 1." *Id. ¶¶* 20–21.

Once they had "essentially complet[ed] development" of the Axiom line, Plaintiff shelved the project due to concerns that the line would compete with its already-on-the-market Ventus line.  *Id.* ¶ 22.  That said, "Fujikura strictly maintained the confidentiality of the [Axiom] research and development work," as it "expected [it] might eventually incorporate this work in future products." *Id.* ¶ 23.  Indeed, Plaintiff protects all its research and development ("R&D") work by locking its building with an alarm, requiring visitors to sign-in and be accompanied by an employee, allowing only authorized personnel into the R&D area, and limiting access to R&D secure file servers.  *Id.* ¶ 30.

## III.  Dee Starts a New Company

Dee resigned from Fujikura in April of 2023.  *Id. ¶* 7.  Six months later, "Fujikura became aware that [Dee] planned to launch a competing golf shaft company called

---

[2] A bias ply is a layer of carbon fiber in a golf shaft which is oriented at 45 degrees relative to the shaft axis.  Schnider Decl. ¶ 10.

Aretera." *Id.* ¶ 9.  Dee then revealed information about Aretera's first project—shafts denominated "A1" and "Alpha"—on a podcast for golf enthusiasts.  *See* Kolitch Decl. ¶ 2; *id.* Ex. A at 28.  Dee stated that spread tow material would (1) make up over half of the shafts' weight; and (2) be present in every part of the shaft that resists twist—i.e., "entirely in the core of the shaft." *Id.* at 13–14.  Per Dee, this approach was "completely different" and "innovative"—"no one ha[d] done something like [it]." *Id.* at 14.  Moreover, this novel structure allowed for significant performance advantages; specifically, "higher ball speeds" and "lower spin off center shots." *Id.* at 15.

## IV.   Did Dee Shaft Fujikura?

After hearing Dee's podcast, Plaintiff became concerned that Dee misappropriated its Axiom shaft concept.  Schnider Decl. ¶ 9.  Specifically, Plaintiff claims the following concept as its intellectual property: using "spread tow, woven carbon fabric for one or more of the bias plies in the core of the shaft," wherein "spread tow material in the newly developed shafts would make up between 45% and 60% of the weight of the shaft" (the "Axiom Technology").  Mot. at 4.

## V.   Plaintiff Investigates

Aretera first demoed its golf shafts on January 23, 2024.  Schnider Decl. ¶ 26.  At that point, Plaintiff "noticed striking visual similarities between the Aretera shafts and the confidential branding concepts developed at Fujikura under [Dee's] direction." *Id.*  After Aretera's shafts were formally launched in February, Plaintiff reverse-engineered them and, in April of 2024, determined that "the Aretera shafts use technology created at Fujikura under [Dee]'s supervision." *Id.* ¶¶ 27–28; *see also id.* Ex. B (summarizing investigatory findings that (1) the Aretera shafts used spread tow fabric "in three . . .plies by two . . . sheets to make up the entire bias core of the shaft," (2) the Axiom shafts "shared the same and/or similar spread tow material layouts in combination with Pitch 70T carbon fiber as Aretera," and (3) both Aretera and Axiom shafts "don't use any regular unidirectional sheets as the bias core.").

/ / /

Defendants contest Plaintiff's reverse-engineering determination. Specifically, Dee declares under penalty of perjury that (1) "Aretera's Alpha One line is not based on Fujikura's [Axiom] product line in any respect" and (2) he "did not use any Fujikura confidential information in the development of Alpha One." Dee Decl. ¶ 8 (emphasis omitted). Dee also contends that Fujikura's Axiom Technology is either already known in the industry or "obvious" based on publicly available golf shaft designs. Dee Decl. ¶¶ 12–19. Dee points out that Aldila's Mamba shaft features spread tow fabric in "opposing 45-degree angle formations" in the interior and exterior of its tip section, Mitsubishi's Diamana putter line incorporates spread tow fabric along most of the length of the shaft's exterior, and True Temper's Project X shafts use spread tow fabric internally and externally for various applications. *Id.*; *see also id.* Exs. A–C.

## VI.    Requested Injunction

Plaintiff seeks "to enjoin Defendants from (1) any further disclosure or use of Fujikura's confidential golf shaft technology involving the use of spread tow carbon material in the bias plies of the shaft; and (2) any further use of Fujikura's branding concepts 'Alpha 1' or 'AX1' to advertise golf shafts, including ordering Defendants to stop all advertising, sales, public disclosure, or discussion of [the] Aretera Alpha One Series of golf shafts." Mot. at 19.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the moving party must show: (1) likely success on the merits; (2) likely irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Id.* at 20. Although the movant must make a showing on each element, the Ninth Circuit employs a "version of the sliding scale" approach where "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011). Under this approach, a

court may issue a preliminary injunction where there are "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff . . . , so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

Most preliminary injunctions are prohibitory; they "prohibit[] a party from taking action and 'preserve[] the status quo pending a determination of the action on the merits.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009) (quoting *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988)).  Where, by contrast, a requested injunction would require the nonmovant to take affirmative action to alter the status quo (i.e., a mandatory injunction), the movant must "establish that the law and facts *clearly favor* her position."  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).  Indeed, "mandatory injunctions 'are not granted unless extreme or very serious damage will result and are not issued in doubtful cases.'"  *Marlyn Nutraceuticals*, 571 F.3d at 879 (quoting *Anderson v. United States*, 612 F.2d 1112, 1115 (9th Cir. 1979)).

## DISCUSSION

## I.   Evidentiary Objections

Defendants object to portions of the Schnider Declaration, arguing Schnider (1) lacks personal knowledge about Fujikura's technical analysis of Aretera's shafts, (2) offers insufficient facts to demonstrate that continued sale of Aretera's shafts will harm Fujikura's goodwill or deprive it of a market head start, (3) improperly relies on statements made by others, and (4) offers self-serving, conclusory testimony.  Evid. Objs.  Defendants also contend Plaintiff has failed to authenticate its technical analysis under Federal Rule of Evidence 901.  *Id.*

The Court **OVERRULES** Defendants' Objections.  "Due to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings."  *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013).  District courts may therefore rely on inadmissible evidence at their

discretion.[3]  *See id.*

Moreover, Plaintiff has largely cured the most damning of the Evidentiary Objections—hearsay, lack of personal knowledge, and lack of factual basis—by submitting the Supplemental Schnider Declaration and Kogawa Declaration in reply.  The Evidentiary Objections are thus stale.

## II.   Mandatory v. Prohibitory Injunction

Defendants next attempt to characterize Plaintiff's proposed injunction as mandatory.  Opp'n at 7.  Defendants recognize Plaintiff's proposed injunction is phrased as a prohibition—it *prevents* further disclosure/use of Fujikura's technology and *stops* all advertising, sales, public disclosure, or discussion of the Alpha One line by Defendants. *Id.*  Nevertheless, Defendants argue that because they would have to "take action" to "stop all current sales and advertisement, reclaim and/or destroy existing inventory, and develop, manufacture, and market a new product line," Plaintiff should have to show the law and facts clearly favor its position.  *Id.* (emphasis omitted).

In making this argument, Defendants follow a well-worn path.  Because injunctions can often be stated in either mandatory or prohibitory terms, parties seeking to avoid injunctions often rephrase proposed orders to impose affirmative requirements.  *See Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) ("The distinction between mandatory and prohibitory injunctions is not without ambiguities or critics.").  So, to resolve whether a proposed injunction is mandatory, courts do not focus solely on whether proposed injunctions are affirmatively phrased.  Instead, courts assess whether a proposed injunction alters the status quo: i.e., "the last, uncontested status which preceded the pending controversy."  *Marlyn Nutraceuticals*, 571 F.3d at 879 (quoting *Regents of the Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 514 (9th Cir. 1984)); *Tom Doherty Assocs.*, 60 F.3d at 34.

---

[3] This is not to say that the Court has not assigned lesser or greater weight to evidence based on circumstances indicating its reliability (or lack thereof).  To the contrary, the Court has considered Defendants' critiques when relevant.  The Court notes only that it has not excluded evidence at this stage.

Here, the status quo involves the situation immediately before Dee allegedly shared Plaintiff's trade secrets with Aretera. *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (defining status quo in a trademark infringement case not as the "situation before the filing of a lawsuit," but instead as the situation "before Disney began using its allegedly infringing logo"). Because Plaintiff's proposed injunction would not place Plaintiff in a more advantageous position—or Defendants in a worse position—than where either stood before Defendants allegedly used Plaintiff's trade secret, Plaintiff's proposed injunction does not qualify as mandatory.[4]

## III.   Preliminary Injunction Analysis

Here, all four *Winter* factors favor Plaintiff. The Court will begin with irreparable harm, then address Plaintiff's likelihood of success on the merits, and finally turn to the balance of the equities and the public interest.

### A.   Irreparable Harm

A showing of likely irreparable harm is a threshold requirement for the issuance of injunctive relief. *Oakland Trib., Inc. v. Chron. Publ'g Co.*, 762 F.2d 1374, 1378 (9th Cir. 1985). "Irreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial." *Tom Doherty Assocs.*, 60 F.3d at 38. A plaintiff may not rely on mere allegation but must instead submit "evidence showing [likely] irreparable harm." *PolyPortables LLC v. Endurequest Corp.*, No. 116CV01291DADSKO, 2016 WL 8731384, at *3 (E.D. Cal. Oct. 28, 2016) (citing *Herb Reed Enters.*, 736 F.3d at 1250).

Where the loss of a novel product is concerned, injunctive relief is appropriate when "the availability of [the] product is essential to the life of the business or increases business of the plaintiff beyond sales of that product—for example, by attracting customers who

---

[4] Moreover, Defendants' assertion that Plaintiff's proposed injunction would require them to take affirmative action is unsupported. Nowhere does Plaintiff's proposed injunction require Defendants to reclaim and destroy existing inventory. And, to the extent that Defendants choose to develop a new product to replace that which they are enjoined from selling, they do so of their own free will. The injunction itself does not require such action. *Cf. Marlyn Nutraceuticals*, 571 F.3d at 878–9 (implying injunction requiring the cessation of sales of an infringing product is not subject to a heightened standard).

make purchases of other goods while buying the product in question." *Tom Doherty Assocs.*, 60 F.3d at 38 (emphasis omitted). With this principle in mind, the Ninth Circuit held in *Stuhlbarg International Sales Co. v. John D. Brush & Co.* that "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." 240 F.3d 832, 841 (9th Cir. 2001) (citing *Tom Doherty Associates* for the proposition that "deprivation of opportunity to expand business is irreparable harm"); *cf. Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (affirming a preliminary injunction because a competitor's misappropriation of the plaintiff's technique for creating "novel french fries" would allow said competitor to "profit from its head start and to shut [the plaintiff] out of new markets it is trying to reach").

Following *Stuhlbarg*, numerous district courts in this Circuit have held that "a defendant's ability to gain a competitive advantage through the use of confidential information to develop a competing product is sufficient to constitute irreparable harm." *SolarPark Kor. Co. v. Solaria Corp.*, No. 23-CV-01181-AMO, 2023 WL 4983159, at *8 (N.D. Cal. Aug. 2, 2023) (quoting *E.W. Bank v. Shanker*, No. 20-CV-07364-WHO, 2021 WL 3112452, at *12 (N.D. Cal. July 22, 2021)); *see also WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 853 (N.D. Cal. 2019) (noting competitor's ability to use the plaintiff's trade secrets to accelerate its own progress would likely cause the plaintiff to be irreparably harmed).[5] It is upon this theory—Defendants' usurpation of Plaintiff's opportunity to expand its business through the excitement generated by the release of a novel technology—that Plaintiff relies.

_____

[5] Courts are uniform in their conclusion that threatened disclosure of a trade secret can constitute irreparable harm. *See, e.g.*, *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118–19 (2d Cir. 2009). Here, however, Defendants have already disclosed Plaintiff's alleged trade secret to the public by (1) publicizing the Alpha One shaft concept and (2) releasing said golf shaft for sale. *See* Schnider Decl. ¶ 27. Defendants therefore cannot rely on disclosure to demonstrate a *prospective* risk of irreparable harm. *See CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 403 (8th Cir. 2009) (holding irreparable harm factor weighed against preliminary injunction because the harm "to a large extent[] ha[d] already occurred").

Plaintiff has shown this form of irreparable harm is likely absent an injunction. First, Plaintiff's evidence indicates that novel shaft technologies allow for business expansion. In two previous instances, Plaintiff launched a novel golf shaft technology and thereafter enjoyed substantial market-share gains. *See supra* at 2–4. Second, Plaintiff has established that the Axiom line is similarly situated to the Speeder and Ventus lines. Dee himself has publicly attested that the Axiom Technology, like Ventus' VeloCore, provides performance advantages. Kolitch Decl. Ex. A at 15. Moreover, both Parties recognize that Alpha One—like the Speeder and Ventus lines before it—is targeted at PGA Tour professional players. *See* Dee Decl. ¶ 9; Schnider Decl. ¶ 27; Suppl. Schnider Decl. ¶¶ 4, 8. Alpha One thus threatens to follow the same path as Ventus and Speeder: (1) capture PGA Tour professional players based on performance advantages and (2) leverage use by professionals and the shaft's associated reputational boost to rapidly expand market share elsewhere. This likely usurpation of business opportunity constitutes irreparable harm.[6] *See Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545–46 (7th Cir. 2021) (finding likely irreparable harm because the defendant (1) sold a product developed using stolen trade secrets to the same, difficult to identify group of customers as the plaintiff and (2) interfered with the advantage the plaintiff gained from marketing its product as a unique offering).

Defendants' arguments do not alter the Court's conclusion. First, though Defendants criticize Plaintiff's evidence regarding lost goodwill as "purely speculative," Opp'n at 21, it is unclear what alternative form of evidence Plaintiff could provide to support their theory of irreparable harm. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 263 (3d Cir. 2000) (crediting witness's testimony as to damage to reputation,

---

[6] True, Aretera has already launched its competing golf shaft. But the advantage associated with being "first to market" appears to compound over time. *See* Suppl. Schnider Decl. ¶ 4 (describing how it took three years for the Speeder shaft to become professional golfers' favorite shaft, and five to eight years for Fujikura to reap the related tripling of its shaft business). This evidence suggests that Plaintiff is not yet too late to either (1) enjoy a first-to-market advantage if Aretera's allegedly misappropriated shaft is removed from the market now or (2) head off Aretera's ability to wrongfully enjoy a first-to-market advantage that rightfully should have been Fujikura's. *Cf. Lamb-Weston*, 941 F.2d at 972–75 (affirming preliminary injunction even though the defendant had already begun producing the at-issue curly fries).

credibility, and ability to license stemming from future misappropriation); *Regents*, 747 F.2d at 520 (relying on the plaintiffs' description of anticipated interference with athlete recruitment, dissipation of alumni support, and diminishing athletic rivalries to conclude the plaintiffs faced likely irreparable harm).  Moreover, requiring further evidence would be in tension with the numerous courts that have issued (or affirmed) preliminary injunctions based on similar evidence and theories.  *See, e.g.*, *Lamb-Weston*, 941 F.2d at 974.

Second, Plaintiff has not unduly delayed seeking relief.  Though delay in seeking preliminary relief counsels against a finding of imminent irreparable harm, courts have declined to weigh "delay caused by a plaintiff's good faith efforts to investigate" misappropriation against the issuance of injunctive relief.  *See BP Chems.*, 229 F.3d at 264 (quoting *Tom Doherty Assocs.*, 60 F.3d at 39).  Here, Plaintiff delayed moving for a preliminary injunction while awaiting confirmation, through testing of Aretera's Alpha One shafts, that said shafts use the Axiom Technology.  *See* Reply at 9 (noting Plaintiff completed its analysis of the Aretera shafts in mid-April of 2024 and commenced this action approximately two weeks later).  Moreover, Plaintiff did not sit idly by and allow Aretera to proceed with its shaft development before commencing litigation.  Instead, Plaintiff sent Dee and Aretera multiple warnings regarding Dee's alleged use of its trade secrets.  *See* Compl. Exs. B, D.  Though it may have been more prudent for Fujikura to move for injunctive relief prior to the release of Aretera's shafts, Fujikura's decision to gather additional evidence does not preclude a finding of irreparable harm.

Finally, Plaintiff need not provide evidence of lost sales or market share since the launch of Aretera's shafts.  To the extent Plaintiff can quantify its lost sales/market share, said losses are redressable through monetary damages.  *See PolyPortables*, 2016 WL 8731384, at *4 ("At best, plaintiff has presented some evidence that it has lost some sales to defendant, allegedly because of its theft of trade secrets.  If proven, this is precisely the type of loss compensable by money damages, and it is therefore not irreparable.").  Such evidence, even if available, thus would not weigh in favor of injunctive relief.

Plaintiff has not, however, shown that irreparable harm is likely to result from Defendants' use of the "Alpha 1" and "AX1" marks. The Court agrees that a mark not yet used in commerce *could* possess potential economic value and therefore qualify as a trade secret. *See Mattel, Inc. v. MGA Ent., Inc.*, 782 F. Supp. 2d 911, 962 (C.D. Cal. 2011) (concluding a reasonable fact finder could find that the doll name "Bratz" constituted a trade secret). But to secure preliminary injunctive relief relating to the alleged misappropriation of such a mark, Plaintiff must show that irreparable harm stemming from the use of *that mark* is likely to occur absent an injunction. *See Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) ("[A]n injunction must be narrowly tailored to . . . remedy only the specific harms shown by the plaintiffs . . . ." (citation omitted)). Plaintiff's briefing dedicates no argument whatsoever to this point. So, as Plaintiff has not met its burden to show likely irreparable harm stemming from continued use of the at-issue marks, the Court's remaining analysis will focus only on the Axiom Technology. *See Oakland Trib.*, 762 F.2d at 1376 (noting that where a plaintiff has not shown irreparable harm, a court need not address the other *Winter* factors).

### B.     Likelihood of Success: Trade Secret Misappropriation[1]

Plaintiff brings trade secret claims under the federal Defend Trade Secrets Act ("DTSA") and the California Uniform Trade Secrets Act ("CUTSA"). Compl. ¶¶ 62–89. Where past plaintiffs have elected this approach, "[c]ourts have analyzed the[] claims together because the elements are substantially similar." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). To succeed under either statute, "a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *Id.* at 657–58.

#### 1.     Protectable Trade Secret

A trade secret is "(1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret" through reasonable measures. *Id.* at 657, 660.

a.   Specific Information

A plaintiff must "describe the subject matter of the[ir] trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998) (second alteration in original) (quoting *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 707 F. Supp. 1170, 1177 (C.D. Cal. 1989), *aff'd*, 914 F.2d 1256 (9th Cir. 1990)).   This requirement ensures defendants have sufficient information to "prepare a rebuttal." *InteliClear*, 978 F.3d at 658.   That said, "the reasonable particularity standard . . . does not require explication of the trade secrets 'down to the finest detail or require a mini-trial on misappropriation before plaintiff is allowed discovery.'" *Alphonso Inc. v. Tremor Video, Inc.*, No. 22-CV-03629-NC, 2022 WL 17968081, at *2 (N.D. Cal. Oct. 31, 2022) (quoting *STEMCELL Techs. Can. Inc. v. StemExpress, LLC*, No. 21-CV-01594-VC (LB), 2022 WL 585668, at *4 (N.D. Cal. Feb. 24, 2022)).   Moreover, even if Plaintiff alleges Defendants misappropriated multiple trade secrets, Plaintiff need only identify one trade secret with sufficient particularity to justify an injunction as to that trade secret. *See InteliClear*, 978 F.3d at 659.

Plaintiff has satisfied the "specific information" requirement.   For purposes of its Motion,[7] Plaintiff describes its trade secret as follows: "us[ing] spread tow fabric in one or more of the bias plies in the core of the shaft, potentially along the entire length of the shaft," such that "[t]he amount of spread tow material . . . make[s] up between 45% and 60% of the weight of the shaft."   Schnider Decl. ¶¶ 15, 17.   Plaintiff defines this trade secret somewhat more narrowly in its Complaint, limiting it to shafts that contain spread tow

---

[7] Plaintiff states that, though the rapid development of Alpha One suggests that Defendants may have misappropriated additional information, it is not proceeding under the theory that Defendants misappropriated its "detailed design specifications, drawings, proprietary design software code, and/or physical prototypes."   Mot. at 13 n.2.   Plaintiff, however, indicates it intends to later proceed under this theory if discovery so warrants.   *Id.*   Though Defendants contended otherwise at oral argument, this statement, when read in context, does not waive consideration, as evidence, of Alpha One's rapid development compared to the Axiom Technology.

material along the entire length of their core.  *See* Compl. ¶ 63.  Courts in California have found descriptions of similar or even lesser particularity to be sufficient.[8]

Defendants quibble with Plaintiff's definition, relying primarily on inconsistencies between the Complaint and the Motion.  Specifically, Defendants contend Plaintiff needs to come forward with a single, defined trade secret.  Per Defendants, because the trade secret as defined in the Motion is broader than that described in the Complaint, Plaintiff has not provided adequate specificity.  Opp'n at 10–11.

In so arguing, Defendants misunderstand Plaintiff's burden.  Plaintiff need not limit itself to one trade secret, but instead may proceed under the theory that Defendants misappropriated multiple concepts from them.  *See InteliClear*, 978 F.3d at 659 (noting the plaintiff's "hedging language" was "not fatal to [its] claim").  As both the trade secret identified in the Motion and the trade secret identified in the Complaint are described with sufficient particularity, Plaintiff may proceed regardless of differences between the two documents.[9]

Lastly, the fact that Plaintiff seeks protection for an idea—placing a specific material in the core of a shaft—does not preclude trade secret protection.  Courts within and without California have held that design concepts—including ideas for new products or technologies—are protectable as trade secrets.  *See, e.g.*, *Altavion*, 171 Cal. Rptr. 3d at 731 ("[W]e reject any contention that Altavion's [bar code] concept on the whole was inherently not protectable as a trade secret. . . . [E]ven if some or all of the elements of

---

[8] *See, e.g.*, *Whyte v. Schlage Lock Co.*, 125 Cal. Rptr. 2d 277, 285–86 (Ct. App. 2002) (finding sufficient, among other descriptions, "Schlage's market research data"); *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 171 Cal. Rptr. 3d 714, 728–33 (Ct. App. 2014) (rejecting the defendant's contention that alleged trade secrets were not described with sufficient particularity and concluding plaintiff's bar-code concept was a protectable trade secret); *Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69, 76 (N.D. Cal. 2020) (finding that the statement "a 'specialized process for anodizing unfinished alloy tubes, before machining, for the aerospace industry'" sufficiently identified the alleged trade secret).

[9] Defendants also argue that it is unclear what Plaintiff means by "bias layer," "bias core," and "bias plies." Opp'n at 11.  Plaintiff, however, has expressly defined "bias plies."  *See supra* note 2.  Moreover, Plaintiff has made it sufficiently clear that "bias layer" and "bias core" both refer to one or more bias plies located within the internal core of the shaft.  *See* Schnider Decl. ¶ 15.

Altavion's design were in the public domain and thus unprotectable, the *combination* was a protectable trade secret . . . ." (emphasis in original); *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 716–19 (7th Cir. 2003)[10] (concluding a reasonable jury could find the plaintiff's idea for a new toy—a wooden track with carved grooves to simulate the sound of a locomotive—was entitled to trade secret protection); *Yeiser Rsch. & Dev. LLC v. Teknor Apex Co.*, 281 F. Supp. 3d 1021, 1044 (S.D. Cal. 2017) ("Concepts have value independent of the product they eventually inspire."). Stated simply, "ideas are protectable as trade secrets." *Altavion*, 171 Cal. Rptr. 3d at 735 (emphasis omitted and capitalization altered).

Because Plaintiff has sufficiently identified a protectable form of information—its concept for a novel shaft structure—Plaintiff has likely satisfied the first element of a trade secret's statutory definition.

### b.   Valuable Because It Is Unknown to Others

The definition's second element has two prongs: a plaintiff's trade secret must be (1) secret (i.e., not generally known in the industry) and (2) valuable (i.e., confer a competitive advantage on the trade secret's holder). *See* Cal. Civ. Code § 3426.1(d)(1); *Altavion*, 171 Cal. Rptr. 3d at 738–46.

### i.   Secrecy

First, secrecy. Here, there is no evidence that Plaintiff ever disclosed its Axiom Technology to anyone outside of its business. Indeed, Schnider declares that (1) the "[Axiom] shaft designs were conceived and developed entirely in-house at Fujikura," and (2) Fujikura has "strictly maintained the confidentiality of the [Axiom] research and development work." Schnider Decl. ¶¶ 16, 23. So, Plaintiff has not lost its trade secret through disclosure.

/ / /

---

[10] Though the *PlayWood* court applied Illinois trade secrets law, California courts have recognized that "case law applying UTSA enactments in other states is generally relevant in applying California's UTSA." *Altavion*, 171 Cal. Rptr. 3d at 725.

Defendants nevertheless contend that Plaintiff's trade secret is generally known in the golf shaft industry. Dee's public statements, however, belie Defendants' argument. *Cf. Masimo Corp. v. True Wearables, Inc.*, No. 2021-2146, 2022 WL 205485, at *2 (Fed. Cir. Jan. 24, 2022) ("Under the CUTSA, evidence of how the owner of an alleged trade secret and the alleged misappropriator treat that information is relevant to whether the information is generally known."). Dee, speaking on a podcast, referred to using "spread tow fabric entirely in the core of the shaft" as "power grid technology." Kolitch Decl. Ex. A at 14. He then went on to state: "It's completely different, it's innovative, and it's no one [sic] has done something like this." *Id.* In line with Dee, David Schnider declares that, to Fujikura's knowledge, the Axiom Technology "had never been [used] before." Schnider Decl. ¶ 15. If no other golf manufacturer has yet used spread tow material to make up the core of a shaft or publicized such a concept, it seems unlikely said concept qualifies as "generally known." Moreover, to the extent Dee's declaration contradicts the above statement, Dee's pre-litigation, public-facing testimony is entitled to greater weight than his post-litigation, self-serving testimony.

Defendants reference three other golf shafts in an effort to prove Dee's podcast statements wrong. Unfortunately for Defendants, however, each example is distinguishable. Dee first declares that Aldila's Mamba shaft uses spread tow fabric at a bias angle "in its tip section on both the interior and exterior of the golf shaft." Dee Decl. ¶ 14 & Ex. A. Next, Dee points out that Mitsubishi's Diamana Putter line features spread tow fabric applied on a bias along "the majority of the length" of the shaft's "outer layers." *Id.* ¶ 15 & Ex. B. Finally, Dee notes True Temper Project X Black shafts use spread tow fabric "on the outermost layers of the shaft." *Id.* Ex. C at 1.

Plaintiff, however, does not claim as a trade secret the use of spread tow fabric as applied to the tip of a golf shaft, the external layer of a golf shaft, or even a golf shaft's handle. *See* Schnider Decl. ¶ 14 (noting Fujikura's Ventus shafts use a spread tow ply in their handle section). Instead, Plaintiff asserts as its trade secret the use of spread tow material to make up a shaft's core. *See id.* ¶ 15. None of the above examples demonstrate

that this specific use of spread tow material is generally known in the industry.

Perhaps recognizing the above defects in their examples, Defendants alternatively argue that Plaintiff's purported trade secret is readily ascertainable, i.e., "obvious," and therefore not entitled to trade secret protection. Opp'n at 13–14. In California, however, "whether information is '"readily ascertainable" is not part of the definition of a trade secret.'" *Imax*, 152 F.3d at 1168 n.10 (quoting *ABBA Rubber Co. v. Seaquist*, 286 Cal. Rptr. 518, 528–29 (Ct. App. 1991)). So, "under California law, information can be a trade secret even though it is readily ascertainable, so long as it has *not yet been ascertained* by others in the industry." *ABBA Rubber*, 286 Cal. Rptr. at 528–29 (emphasis added). Indeed, "[u]nlike 'a patentable invention, a trade secret need not be novel or unobvious.' 'The idea need not be complicated; it may be intrinsically simple and nevertheless qualify as a secret, unless it is common knowledge and, therefore, within the public domain.'" *PlayWood Toys*, 342 F.3d at 724 (citations omitted) (first quoting 2 Rudolf Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 14.15, at 14–124 (4th ed. 2003); and then quoting *Forest Lab'ys, Inc. v. Pillsbury Co.*, 452 F.2d 621, 624 (7th Cir. 1971)); *see also Sinclair v. Aquarius Elecs., Inc.*, 116 Cal. Rptr. 654, 658 (Ct. App. 1974) ("[I]t has been said that a trade secret may be a device or process which is clearly anticipated in the prior art . . . [;] [n]ovelty and invention are not requisite for a trade secret as they are for patentability."). Defendants, therefore, cannot escape liability under CUTSA by arguing that Plaintiff's trade secret is insufficiently creative.

Instead, ease of ascertainability is available in California only as a defense to misappropriation. Put differently, Defendants can escape liability by proving that they did not learn the concept for their powergrid technology from Plaintiff, but instead arrived at the idea independently. *See ABBA Rubber*, 286 Cal. Rptr. at 529 n.9; *Imax*, 152 F.3d at 1168 n.10. Here, however, despite the numerous other statements Dee offers in his and Aretera's defense, neither Defendant offers evidence—apart from Dee's self-serving statements—showing that Aretera developed the idea to use spread tow technology in the core of its shaft independently from Dee's exposure to the idea at Fujikura. Obviousness,

therefore, will not save Defendants on this record.[11]

        ii.    Independent Economic Value

When evaluating this prong, courts assess whether the trade secret "gives its owner a competitive advantage." 1 Roger R. Milgrim et al., *Milgrim on Trade Secrets* § 1.07A (2024). Notably, as a product's economic value need only be *potential*, technology associated with an unreleased product can still have independent economic value. *See* Cal. Civ. Code § 3426.1(d)(1).

Plaintiff's Axiom Technology likely has potential independent economic value for three reasons. First, Dee's own public statements confirm the Axiom Technology leads to improved golf performance. *See* Part III.A, *supra*. If a novel technology leads to improved performance among users, it follows that said technology is valuable. *See PlayWood Toys*, 342 F.3d at 726. Second, and relatedly, Plaintiff's Axiom Technology likely has the potential to confer reputational and market share benefits. *See* Part III.A, *supra*. Numerous courts have recognized that a novel technology's potential to create such advantage constitutes independent economic value. *See, e.g.*, *Lumex, Inc. v. Highsmith*, 919 F. Supp. 624, 629–630 (E.D.N.Y. 1996); *Lamb Weston*, 941 F.2d at 972–74; *Contour Design, Inc. v. Chance Mold Steel Co.*, No. CIV. 09-CV-451-JL, 2010 WL 174315, at *6 (D.N.H. Jan. 14, 2010); *Shanker*, 2021 WL 3112452, at *12. So too here.

Finally, Schnider declares that Fujikura spent more than two years developing the Axiom Technology and testing its feasibility. Schnider Decl. ¶¶ 15, 18. Such an investment constitutes circumstantial evidence of the technology's value. *See, e.g.*, *Altavion*, 171 Cal. Rptr. 3d at 744–45.

Defendants make much of Plaintiff's decision not to launch its Axiom Technology in 2020. Opp'n at 24 ("[I]t is peculiar that the [Axiom] product line suddenly became

---

[11] The closest Dee comes to offering such evidence involves the following statements: "[Aretera] independently created a unique and high performing golf club shaft product line . . . . Aretera's Alpha One line is not based on Fujikura's [Axiom] product line in any respect. I also did not use any Fujikura confidential information in the development of Alpha One." Dee Decl. ¶ 8 (emphasis omitted).

valuable to Plaintiff only after Mr. Dee . . . joined Aretera."). Nothing in trade secret law, however, requires an inventor to take their invention to market as fast as possible. *See* 1 Milgrim, *supra*, § 1.08 ("[E]very inventor has the right to keep his invention secret . . . ."); *cf. Sinclair*, 116 Cal. Rptr. at 658 ("[A]ppellant's claim that the inventor did not utilize the device in [h]is own business is entirely immaterial . . . ."). So long as the at-issue information (1) retains potential value and (2) remains secret, it will retain trade secret protection regardless of how long the inventor sits on their creation. *See PlayWood Toys*, 342 F.3d at 729 ("Until disclosed . . . the trade secret should be entitled to protection." (quoting 1 Milgrim, *supra*, § 1.05)). So, if an inventor believes it will benefit her to delay release of her valuable idea, trade secret law does not stand in her way.

Plaintiff, moreover, did not delay releasing its Axiom shafts because it deemed them valueless. Instead, Plaintiff recognized that Axiom could render its Ventus line obsolete. *See* Schnider Decl. ¶ 22 (noting Plaintiff "shelve[d] the [Axiom] project at least temporarily" because "[t]he Ventus line had become so popular in the high-end market . . . that Fujikura saw no need to introduce another competing line of premium shafts."). Such a decision does not, as Defendants contend, constitute evidence of lack of value.

In sum, the weight of the evidence indicates that Plaintiff's Axiom Technology likely possesses potential independent economic value derived from its secrecy.

###### c. Reasonable Measures to Keep Secret

Unlike the previous elements of a protectable trade secret, this final prong requires little analysis. Plaintiff need not demonstrate it perfectly preserved the secrecy of the Axiom Technology; instead, Plaintiff need only show it took "reasonable steps to maintain secrecy." *InteliClear*, 978 F.3d at 660. Here, Schnider declares that (1) "[a]ll of Fujikura's employment agreements, including Mr. Dee's, include an obligation not to use or disclose any of Fujikura's confidential information"; (2) "the Fujikura building is locked with an alarm during non-business hours"; (3) "[a]ll visitors must check in and sign in, and visitors are accompanied by a Fujikura employee at all times"; (4) "[o]nly authorized personnel are

allowed into the Fujikura R&D/Engineering area”; and (5) “Fujikura uses secure file servers and is generally paperless.”   Schnider Decl. ¶¶ 29–30.   At the preliminary injunction and summary judgment stages, courts have repeatedly held similar steps likely constitute reasonable protections sufficient to confer trade secret status.   *See, e.g.*, *InteliClear*, 978 F.3d at 661 (“InteliClear’s efforts to protect its trade secrets through licensing agreements constitute reasonable measures . . . .”); *Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1207 (E.D. Cal. 2020) (similar).   The Court finds the same here.[12]

In sum, the Court concludes that Plaintiff has shown its Axiom Technology likely constitutes a protectable trade secret.   Whether Plaintiff is likely to succeed on the merits turns, therefore, on whether Plaintiff has provided sufficient evidence of Defendants’ misappropriation and resulting harm therefrom.

### 2.   Misappropriation

Plaintiff relies on a “disclosure or use” theory of misappropriation.   *See* Mot. at 14. To commit misappropriation under this theory, a defendant must first “[d]isclos[e] or use . . . a trade secret of another without express or implied consent.”   Cal. Civ. Code § 3426.1(b)(2).   Second, “[a]t the time of disclosure or use, [the defendant must] kn[o]w or ha[ve] reason to know that [their] knowledge of the trade secret was,” among other possibilities, either “[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use” or “[d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.”   *Id.* § 3426.1(b)(2)(B)(ii), (iii).

### a.   Disclosure or Use

Both Dee and Aretera likely misappropriated Plaintiff’s trade secret.   First, Dee owed a duty, through contract, to maintain the secrecy of information gained from—and inventions he/his team developed during working hours while at—Fujikura.   *See*

---

[12] Indeed, Defendants do not contest the reasonableness of Plaintiff’s efforts in this regard.

Confidentiality Agreement at 1–2; Schnider Decl. ¶ 6.  Second, Dee admits that he oversaw the development of Fujikura's Axiom line, which, per Schnider, "use[d] spread tow fabric in one or more of the bias plies in the core of the shaft, potentially along the entire length of the shaft."  *Id.* ¶ 15; Dee Decl. ¶ 6.  Third, Dee stated that the main innovation in the Alpha One line—its "powergrid technology"—involves "spread tow fabric entirely in the core of the shaft," which is the very concept claimed as a trade secret by Plaintiff.  Kolitch Decl. Ex. A at 14.  Lastly, Aretera launched its powergrid technology after spending approximately six months developing the shaft.  Dee Decl. ¶ 7; Schnider Decl. ¶ 27.  The pace of this development poses a marked contrast to the Dee-led effort at Fujikura, which lasted more than two years.  *See id.* 15–18.

The above evidence shows Dee (1) had access to Plaintiff's trade secret concept and (2) thereafter developed a product using a similar concept.  Courts have inferred likely use of a competitor's trade secret based on similar evidence.  *See Stratienko v. Cordis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005) (citing cases wherein the Second, Third, Fourth, Seventh, Eighth, Ninth, and Federal Circuits permitted an inference of use based on circumstantial evidence of access and similarity of design).  Thus, Dee, and through him, Aretera, likely used Plaintiff's trade secret.

### b.    Defendants' Knowledge

Both Dee and Aretera, moreover, likely knew or had reason to know that their "powergrid technology" was misappropriated from Plaintiff.

Dee must have known that (1) he signed a contract requiring him to refrain from disclosing or using information or inventions he accessed/created while at Fujikura and (2) he or his team came up with the idea of using spread tow fabric to make up the core of a shaft while at he was at Fujikura.  Indeed, Plaintiff sent two warnings to Dee to remind him of his obligations to Fujikura, one of which explicitly referenced "a new golf shaft technology related to shafts with spread tow carbon fiber fabric in the bias layer."  Compl. Ex. D at 3, *id.* Ex. B.

/ / /

As for Aretera, absent the defense of independent invention, Dee's knowledge of from whence he acquired the concept for the Alpha One shaft can likely be imputed to Aretera.  To be sure, the Ninth Circuit has held "it is generally not appropriate to direct a jury to impute an agent's knowledge of a secret to the principal" where trade secrets are concerned.  *See Droeger v. Welsh Sporting Goods Corp.*, 541 F.2d 790, 792–93 (9th Cir. 1976).  In *Droeger*, however, the issue was whether imputation of knowledge from an employee could conclusively preclude the defense of independent invention, even if the employee in question never communicated the secret to their employer.  *See id.  Droeger* did not hold a company can avoid misappropriation liability when profiting from a product its *founder* created using misappropriated information.  *Cf. Beluca Ventures LLC v. Einride Aktiebolag*, 660 F. Supp. 3d 898, 911 n.8 (N.D. Cal. 2023) (concluding a managing partner's knowledge of his duty to maintain confidentiality can be imputed to his corporation); *Contour Design*, 2010 WL 174315, at *7 (imputing, in a trade secrets case, the knowledge of a corporation's president to the corporation).  And even if imputation were unavailable, Aretera was made aware that ideas from Dee could be subject to trade secret protection by Fujikura's warning letters, at least one of which was addressed to Aretera.  *See* Compl. Exs. B, C, D.  Aretera thus likely knew or had reason to know that Dee's shaft concept was Fujikura's trade secret.[13]

### c.    Defendants' Counterarguments

Defendants argue Plaintiff's misappropriation theory relies on a trade secret doctrine—inevitable disclosure—that California has rejected.  Opp'n at 18 (citing *Whyte*, 125 Cal. Rptr. 2d at 290–94).  This argument, however, mischaracterizes Plaintiff's case.  The inevitable disclosure doctrine allows "a trade secret owner to prevent a former employee from working for a competitor despite the owner's failure to prove the employee

---

[13] Finally, even if the above theories were insufficient, Aretera can likely be held vicariously liable for Dee's misappropriation.  *See Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1188 (W.D. Wash. 2019); *SolarCity Corp. v. Pure Solar Co.*, No. CV1601814BRODTBX, 2016 WL 11019989, at *5 (C.D. Cal. Dec. 27, 2016).

has taken or threatens to use trade secrets." *Whyte*, 125 Cal. Rptr. 2d at 281. Because this doctrine presupposes that an employee cannot help but rely on his knowledge when working for a competitor, it "results in an injunction prohibiting employment, not just use of trade secrets." *Id.* at 290. Here, because Plaintiff has offered substantial evidence suggesting that Dee *used* the trade secret in question, Plaintiff need not rely on inevitable disclosure. Moreover, Plaintiff does not seek an injunction preventing Dee from working for Aretera. Consequently, the inevitable disclosure doctrine is irrelevant.

Nor is Defendants' reliance on alleged differences between its Alpha One shafts and Plaintiff's Axiom shafts persuasive. Defendants argue the Alpha One shafts differ in "design goals, target consumer profile, material selection, ply cutting process, tooling, and specification, among other things." Opp'n at 18–19 (footnotes omitted). Setting aside the accuracy of these contentions,[14] said differences have little relevance. Plaintiff has neither claimed the specific type of spread tow material contained within its Axiom shafts, nor the tooling of its shafts, as a trade secret. Instead, Plaintiff lays claim to the concept of using layers of spread tow fabric at a bias along the core of a shaft. If, as the evidence to this point shows, Defendants likely misappropriated this concept from Plaintiff, the fact that their Alpha One shafts differ from Plaintiff's Axiom prototypes in other respects does not preclude misappropriation liability.[15]

The weight of the evidence thus suggests that Defendants likely misappropriated Plaintiff's Axiom Technology.

---

[14] For instance, evidence before the Court suggests that both the Axiom and Alpha One lines target (1) the premium market and (2) professional golfers. *See* Schnider Decl. ¶¶ 15; Dee Decl. ¶ 9.

[15] Defendants also cannot rely on the contention that they have made modifications to Plaintiff's initial concept. Courts have recognized that "[t]he scope of what might constitute misappropriation is broad." *Yeiser Rsch. & Dev.*, 281 F. Supp. 3d at 1047. Indeed, "[m]isappropriation includes not only wholesale pirating of an ideas [sic], but also the unauthorized utilization of an idea as a starting point or guide in developing a process or as a means to understand what pitfalls to avoid." *Id.* (quoting *Savor, Inc. v. FMR Corp.*, No. CIV.A. 00C-10-149JRS, 2004 WL 1965869, at *8 (Del. Super. Ct. July 15, 2004)); *see also Mangren Rsch. & Dev. Corp. v. Nat'l Chem. Co.*, 87 F.3d 937, 944 (7th Cir. 1996) ("[I]f trade secret law were not flexible enough to encompass modified or even new products that are substantially derived from the trade secret of another, the protections that law provides would be hollow indeed.").

### 3.      Damage to Plaintiff

Defendants' Opposition does not address the third element of Plaintiff's cause of action—resulting damage.  In any event, the Court has already found Plaintiff is likely to suffer irreparable harm if Defendants are allowed to continue selling their Alpha One shafts.  *See* Part III.A, *supra*.

As all three elements of its claim are likely satisfied, the Court finds Plaintiff likely to succeed on the merits of its trade secret misappropriation claim.

### C.      Balance of the Equities

To resolve this factor, the Court "must 'balance the interests of all parties and weigh the damage to each.'"  *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 852 (9th Cir. 2019) (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009)).

In the Order, the Court recognized that it was "particularly hesitant" to issue Plaintiff's requested temporary restraining order without briefing in opposition because "Plaintiff's injunction would bar Aretera's sales in their entirety."  Order at 7.  Defendants seize on this language, arguing that "the relative size and strength of the parties strongly suggest that the hardship suffered by Defendants will be tremendously greater should a preliminary injunction issue [than would be] the hardship [suffered] by Plaintiff should a preliminary injunction not issue."  Opp'n at 23.  Now that both sides have had the opportunity to submit evidence, however, the Court gives little weight to Defendants' hardship argument.  This is true for two reasons.

First, though "[t]he threat of being driven out of business is sufficient to establish irreparable harm," *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (alteration in original) (quoting *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985)), Defendants offer slim evidence suggesting that Plaintiff's proposed injunction is likely to put them out of business.  *See* Dee Decl. ¶ 29.  True, the proposed injunction will prevent the sale of Aretera's only "fully developed" product.  *Id.* ¶ 8.  But nothing in Plaintiff's injunction prevents Aretera from (1) developing and selling other products and (2) attracting additional investors to keep themselves afloat in

the meantime.  Indeed, in similar circumstances, the Seventh Circuit has affirmed a district court's decision to issue a preliminary injunction preventing further sales of a product developed using likely misappropriated trade secrets.  *See Life Spine*, 8 F.4th at 546 (recognizing the plaintiff would be required to pull a product and "possibly go[] out of business," but nevertheless concluding that "the *potential* harm to [the defendant] did not tip the balance" (emphasis added)).[16]

Second, a contrary conclusion would reward Aretera for proceeding with the development and sale of its Alpha One line despite receiving multiple warnings from Fujikura.  Courts have repeatedly rejected this outcome.[17]  *See, e.g.*, *Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 829–30 (9th Cir. 1997) (noting where a plaintiff makes a strong showing of likely success on the merits, harm to the infringer's business stemming from lost sales of the infringing work/product "cannot be accorded significant—if any—weight"); *Rebecca Bamberger Works, LLC v. Bamberger*, No. 24-CV-706 JLS (DDL), 2024 WL 2805323, at *19 (S.D. Cal. May 31, 2024) (declining to "reward [the d]efendants for their likely unlawful actions"); *Pac. Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1199 (E.D. Wash. 2003) (crediting plaintiff's argument that "a defendant who builds a business based upon a clear violation of the trade secrets and employment agreements of the plaintiff cannot defeat a preliminary injunction by claiming the business will be harmed . . . .").  The Court finds, given Plaintiff's showing of likely irreparable harm, *see supra* Part III.A, that the balance of the equities favors Plaintiff.

### D.  Public Interest

This portion of the analysis requires the Court to consider whether "the public interests that might be injured by a preliminary injunction . . . outweigh the public interests

---

[16] Notably, Dee's declaration implies that Aretera is developing other product lines, *see* Dee Decl. ¶ 8, and Defendants' Opposition acknowledges Defendants could resort to developing other products, Opp'n at 23.

[17] The same logic defeats Defendants' argument regarding the reputational harm Dee may suffer from being labeled a likely misappropriator.

that will be served." *See All. for the Wild Rockies*, 632 F.3d at 1138.  It "primarily addresses impact on non-parties rather than parties."  *CTIA*, 928 F.3d at 852 (quoting *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931–32 (9th Cir. 2003)).

Congress and California's legislature, by passing trade secret legislation, have indicated that the public interest favors the issuance of injunctions that prevent continued misuse of trade secrets and trademarks.  *See Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1078 (N.D. Cal. 2016); *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1092 (E.D. Cal. 2012); 11A Charles A. Wright et al., *Federal Practice and Procedure* § 2948.4 (3d ed. April 2023 Update) ("A federal statute prohibiting the threatened acts that are the subject matter of the litigation has been considered a strong factor in favor of granting a preliminary injunction.").

Tilting the other way, however, is the Golden State's strong public policy in favor of employee mobility.  *See Pyro Spectaculars*, 861 F. Supp. 2d at 1092 ("California has a 'settled legislative policy in favor of open competition and employee mobility,' protecting 'the important legal right of persons to engage in businesses and occupations of their choosing.'" (quoting *Edwards v. Arthur Andersen LLP*, 189 P.3d 285, 291 (Cal. 2008))). This is not a case where an employee has been caught stealing specific documents or schematics from his company's hard drive.  Instead, this is a case where a former employee is accused of repurposing a concept he and his team originally conceived while working for the company.  Enjoining conduct such as this will make it more difficult for employees—particularly those employed in creative fields—to change employers.

Although these two California policies—aggressive enforcement of trade-secret rights and vigorous defense of an employee's right to move—initially appear in conflict, they in fact operate in harmony.  Dee was free to start Aretera because California law precludes most forms of employee-targeted noncompete agreements.  *See Edwards*, 189 P.3d at 291.  In turn, as Fujikura cannot avail itself of the sure safeguard a noncompete would provide, broad trade secret protections ensure Fujikura has a remedy in the event a former employee seeks to reap the rewards of Fujikura's R&D efforts.  So, California's

strong public policy favoring employee mobility does not here outweigh the public's interest in trade secret protection.

Indeed, entering an injunction here will not preclude Dee from continued employment with Aretera. Dee remains free to work on ideas that Aretera can demonstrate were developed independently from Dee's employment at Fujikura. Moreover, Dee may rely on the expertise he developed at Fujikura without running afoul of trade secrets law. Dee is barred only from engaging in the very conduct he likely perpetrated here—copying wholesale a concept at the heart of one of Fujikura's prototypes.

Having now addressed all four factors, the Court concludes that Plaintiff has satisfied its burden with respect to each. So, the Court will issue a preliminary injunction.

**IV.   Bond**

Federal Rule of Civil Procedure 65(c) states that a preliminary injunction may issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Despite the mandatory phrasing of this rule, Rule 65(c) "invests the district court 'with discretion as to the amount of security required, *if any*'" and allows a court to "dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (emphasis in original) (quoting *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)).

Neither party addressed the issue of bond in their moving papers. When pressed at oral argument, however, Plaintiff conceded a bond was necessary, stated Fujikura had the ability to pay a bond, and suggested the amount be extrapolated from the Alpha One line's profits to date. Defendants agreed, indicating they would be willing to provide the necessary sales information after the Parties finalized a protective order.

To avoid incentivizing delay of this production, the Court's injunction will commence seven days from the date of this Order, regardless of whether a bond has yet been set or paid. If Defendants ultimately fail to post the bond set by the Court, however,

the Court will impose appropriate sanctions.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Preliminary Injunction (ECF No. 2).  Pending the conclusion of the litigation in this matter,[18] the Court **ORDERS** as follows: Except to the extent required to comply with this Order or participate in this litigation, Defendants, their officers, agents, servants, employees, attorneys, and anyone in active concert or participation with any of the above **SHALL NOT** engage in any further disclosure or use of Plaintiff's trade secret golf shaft technology; specifically, using spread tow material in one or more of the bias plies in the core of a shaft, such that spread tow material makes up between 45% and 60% of the weight of the shaft.  Accordingly, Defendants **SHALL REFRAIN** from further advertising and sales of their Alpha One line so long as said line continues to incorporate Plaintiff's trade secret golf shaft technology.  The Court **GRANTS** Defendants <u>seven (7) days</u> to come into compliance with this Order.

/ / /

/ / /

/ / /

/ / /

/ / /

---

[18] Neither party addressed in their briefing the maximum length of a preliminary injunction in this case. And, at oral argument, Defendants indicated a bond amount should cover the entirety of this litigation, including trial.  Defendants' only statement to the contrary—their contention, raised for the first time at oral argument, that a preliminary injunction should last only the amount of time it took Plaintiff to reverse-engineer the Alpha One shaft—is illogical.  Had Defendants not likely misappropriated Plaintiff's trade secret, there would be no Alpha One shaft for competing golf shaft manufacturers to reverse engineer.  A more accurate duration would instead seem to be the difference in time between Plaintiff's R&D efforts and Defendants' R&D efforts—approximately 1.5 years.

Absent full briefing by the parties, however, the Court declines to set a firm cut-off for a preliminary injunction at this time.  Though a preliminary injunction in this case should not continue indefinitely, *see Lamb-Weston*, 941 F.2d at 975, a decision on the preliminary injunction's ultimate length can await a motion to dissolve or modify.

Lastly, the Parties **SHALL FILE** a joint proposal for a bond amount—including supporting evidence and not to exceed <u>ten (10) pages</u> of argument—within <u>twenty-one (21) days</u> of the date of this Order.

  **IT IS SO ORDERED.**

Dated: June 28, 2024

          *Janis L. Sammartino*

          Hon. Janis L. Sammartino
          United States District Judge